UNITED STATES of America, Plaintiff,

v.

**ELEVEN THOUSAND FIVE HUNDRED AND EIGHTY DOLLARS ($11,580) IN UNITED STATES CURRENCY, Defendant.**

No. 76–384 Civ. T–K.

United States District Court,
M. D. Florida,
Tampa Division.

July 14, 1978.

Anthony J. LaSpada, Asst. U. S. Atty., Tampa, Fla., for plaintiff.

Bernard H. Dempsey, Jr., Tampa, Fla., for defendant.

## MEMORANDUM OF DECISION INCLUDING FINDINGS AND CONCLUSIONS

KRENTZMAN, District Judge.

In No. 76–384–Civil, the plaintiff, United States of America, seeks the forfeiture of United States Currency in the amount of $11,580 pursuant to Title 31, United States Code, Sections 1101 and 1102, the Currency and Monetary Instruments Reporting Act. Jurisdiction is founded upon both 28 U.S.C. § 1345 and § 1355.

This action was initiated by the filing of a Complaint For Forfeiture by the United States on May 17, 1976. On July 30, 1976 a Claim, answer and Affirmative Defenses was filed by claimants Emmett A. Moran, P. A. and the law firm of Dempsey & Kelly. On November 23, 1976, the United States of America filed its Motion for Summary Judgment. On December 7, 1976, the claimants were, by the Court's Order, given ten (10) days to respond to the plaintiff's motion. An Order for continuance was granted on December 21, 1976 and directed to respond within ten (10) days after completion of their pending discovery. On April 21, 1977, claimants presented their Memorandum in Opposition to Plaintiff's Motion for Summary Judgment. On September 20, 1977, this Court issued an Order for Pretrial Conference, limiting time for completion of discovery and scheduling trial. On December 1, 1977, this Court decided in its Order of that date that there were genuine issues of material fact and plaintiff's Motion for Summary Judgment was denied. However, in that Order, this Court held and the claimants agreed that the United States Currency was covered by and subject to the provisions of Title 31, Sections 1101 and 1102 of the United States Code. On December 12, 1977 an ORDER for extension of discovery was granted pursuant to stipulation of the parties. A pretrial stipulation was submitted in accordance with the Rules and the Order of this Court. Trial briefs of the parties were filed and on June 1, 1978, this matter came before this Court for trial of all facts and issues of law.

A three-tiered approach is necessary for a proper analysis of the issues raised. The Court must first determine whether the plaintiff has proved requisite cause for the seizure of the currency. If the Court finds this cause, then the burden shifts to the claimants to establish by a preponderance of the evidence that they possess sufficient standing to claim the currency pursuant to the Rules of Civil Procedure and the established case law. If it is the determination of this Court that the claimants possess the requisite standing to claim the currency they are then entitled to present any affirmative defenses to the forfeiture of the currency.

Although this is not a list of the complete issues or combination of issues presented to this court, this brief introduction will provide an overview of the unique legal controversies presented.

## FINDINGS OF FACTS

On June 5, 1975, pursuant to some un-specified suspicion of the U. S. Customs Service that narcotics would be transported to the United States and pursuant to a routine surveillance normally set up by the Customs Service of all banana ships arriving in the Port of Tampa, Officer Richard A. Rhodes was observing the vessel M/V CAVALLINO in the early morning hours.

The M/V CAVALLINO had arrived in the Port of Tampa on June 3, 1975, and was engaged in the banana trade between the United States and Honduras. It is common knowledge within the Tampa area that there have been many instances where banana boats arriving from Honduras and Colombia have transported contraband or controlled substances subsequently found aboard the vessel. As such, there is reasonable cause to suspect that such a banana boat may be transporting a controlled or contraband substance which may be attempted to be smuggled or illegally entered into the United States. At 2:30 a. m. Officer Rhodes was located in the "eyeball position" observing the vessel from his position in a van type vehicle. Officer Rhodes testified that he was able to clearly observe virtually the whole length of the vessel and had a clear view of the gangway area. This is the area where all persons coming to or from the vessel would normally board and leave the vessel. The gangway area was well lighted.

Officer Rhodes had a clear, unobstructed view of the vessel and was aided by a pair of binoculars. There was a Custom Patrol car in the immediate vicinity to provide Officer Rhodes whatever assistance he required. There was also a Tampa Police Department cruiser in the immediate area which would be available if required. Officer Rhodes was in radio contact with all units.

At approximately 2:30 or 2:45 in the morning hours of June 5, 1976, Officer Rhodes observed a person whom he identified as a crewman. He had never previously identified this individual but stated that the individual was dressed in crewman like clothing and came from inside the vessel at approximately 2:30 a. m. The crewman came from inside the vessel to the gangway area, he carefully looked around the area two or three times, then just left the area and re-entered the vessel's interior. Just minutes later an automobile with two occupants drove up and parked a few feet away from the gangway in a position allowing Officer Rhodes to have a clear view of the inside of the vehicle. Officer Rhodes saw the same crewmember who had appeared before emerge from the vessel. The crewman readily observed the automobile that had arrived and proceeded down the gangway with something in his hands. The crewman walked over to the automobile and leaned into the auto to converse with its occupants. The crewman remained very briefly, for one or two minutes, and then Officer Rhodes saw him depart the area, and proceed up the gangway without the "sack" or "bundle" he had upon his departure from the vessel and disappear into the ship. It was clear that the crewman did not have the package as CPO Rhodes observed the crewman bound up the gangway using both hands.

. Based upon the history of these banana vessels and what he observed, CPO Rhodes was convinced that something had been placed in the automobile. At this point the automobile sped away from the area. CPO Rhodes contacted the patrol cars cruising the area. The Customs Patrol car followed the suspect automobile from its position at 13th Street and Adamo Drive, as it was leaving the immediate area, to 19th Street and Adamo Drive. At this point the Tampa Police Department cruiser arrived, and the suspect auto was stopped.

CPO Gonsalves asked the men to get out of the automobile and identified himself. He was accompanied by Tampa Police Department officers in uniform. CPO Gonsalves and Tampa Police Department Officer Osting brought the two individuals back to the patrol car to search them for weapons and to attempt to identify the suspects. In the interim Tampa Police Department Officer Geoffrion walked up to the car and

looked inside. There, in plain view, in the middle of the front floor of the automobile, but closer to the passenger's side, was a manila type envelope. The Tampa Police Department officer, looking from outside the vehicle, looked in and observed money in the partially open envelope. The officer reached in and picked up the envelope and brought the money back to the officers Gonsalves and Osting who were with the occupants of the vehicle. The driver had been identified as Julio Hermes Moscoso and the passenger as Enrique Bonilla-Restrepo. The officers made a rapid, unverified count and discovered some $11,600 of U. S. Currency.

At this point, not yet knowing the significance of the currency's discovery, the officers felt that the suspects should be read their rights and these were, in fact, read by Officer Gonsalves. Both were willing to speak but said little except that the money was not theirs and they didn't know anything about its ownership. Bonilla-Restrepo both stated in rough English and by the motions of putting his arms by his head and indicating a sleeping position, that he had been asleep, didn't know about the money or anything else, and that it was not his money. He used his hands to motion away and stated "No, no, no, not my money."

At this point the subjects were transported to the Customs Patrol Office for further questioning. Special Agent Dennis Corbin, Office of Investigations, U. S. Customs Service was called at home and proceeded to the Patrol Office. In addition, Border Patrol Officers Hession and Adair, DEA Agents Miller and Worsham, IRS Agent Willis and Secret Service Agent Wellman were notified. The Border Patrol Officers checked Bonilla's Alien Registration card and discovered it was a forgery. Bonilla was therefore arrested. The currency was examined by a Secret Service agent who discovered one (1) counterfeit $20 note.

Mr. Moscoso explained that he was there as a result of having met a man with a Cuban accent in a Miami bar. The Cuban man told Moscoso that if he would drive to Tampa to a specified location at the City

Docks and pull up to a vessel with an Italian name a crewman would leave the vessel and bring him something to place in his car. He was to bring it back to the Miami bar where the Cuban man would locate him and pay him $250.00 for his troubles. He claimed to know nothing of the contents of the package, although the package was opened when the police officers looked into the car. Customs Patrol Officer Gonsalves requested that Moscoso sign a Customs Form 4607, NOTICE OF ABANDONMENT AND ASSENT TO FORFEITURE OF PROHIBITED OR SEIZED MERCHANDISE. The form was prepared and Moscoso readily and voluntarily signed it. Trial Exhibit # 3. Through this entire period Mr. Bonilla denied knowledge of the ownership of the currency and explicitly stated to Customs Officers, the Tampa Police Department Officers, Border Patrol Officers and anyone else who would listen, that the currency was not his. Mr. Moscoso was released and Mr. Bonilla was incarcerated.

There came a time when Mr. Bonilla was in some way put in touch with attorney Moran, a claimant in the cause. Mr. Bonilla signed an affidavit which had been prepared by claimant Moran wherein he alleged to have an unspecified interest in the currency. Mr. Moran associated Mr. Dempsey who prepared and Bonilla signed an assignment of the currency to Messrs. Moran and Dempsey.

Mr. Moran testified that Mr. Bonilla was primarily interested in getting out of jail. He was anxious to meet the bond requirements. Claimant Moran testified that Bonilla would have done just about anything to get out of jail. The Court accepts this as a finding of fact. Mr. Bonilla swore at a bond reduction hearing that if bond were granted he would show up for all proceedings. He was released and failed to show up again. He is now a fugitive. He has not been heard from since that time.

### CONCLUSIONS OF LAW

First, it has been stipulated by the parties, and the Court agrees that the defendant currency is a "monetary instrument"

within the meaning of 31 U.S.C. 1101 *et seq.* Further, it has been stipulated and agreed that a report is required to be filed by one transporting or receiving a monetary instrument in excess of Five Thousand Dollars ($5,000) transported from a place outside the United States to a place within the United States.

### a. Probable Cause for Seizure

█ This Court finds that there was clearly probable cause for the seizure of the currency. The circumstances of the surveillance and the observations of the officers clearly constitute probable cause to stop the suspected auto and seize the currency. Further, it is the testimony of the officers, and the finding of this Court, that the currency was in "plain view" of the Tampa Police Department officer. Finally, it is clear that the Customs officers, and the Tampa Police Department officers assisting them (Footnote 1: 19 U.S.C. § 507) had the requisite reasonable suspicion to believe that a contraband or dutiable item has been introduced into the United States and had, therefore, exercised a valid search and seizure pursuant to the Customs "border search" authority. *U. S. v. Hill,* 430 F.2d 129 (5th Cir. 1970), *U. S. v. Bowman,* 502 F.2d 1215 (5th Cir. 1974). In *Hill, supra,* the Court stated at page 130:

> "The class of persons who may be subjected to a border search is not limited to those suspected persons who are searched for contraband upon first entering in the United States. Also included in the class are . . . persons engaged in suspicious activities near a border area . . ."

In any event, the United States has clearly established probable cause for the seizure of the currency.

### b. Forfeiture of the Currency

The Court finds that the Government has proved by a preponderance of the evidence and has therefore shown a reasonable cause to believe that the defendant currency was on the M/V CAVALLINO when it came into the jurisdiction of the United States from Honduras. As such, this Court also finds that the currency was transported from a place outside the United States to a place within the United States by an unidentified crewmember of the M/V CAVALLINO who removed the defendant currency from the vessel docked at the Tampa City docks and delivered said currency to Mr. Julio Hermes Moscoso and Mr. Enrique Bonilla-Restrepo. Further this same currency was located by the Customs and/or Tampa Police Department officers in the automobile of Mr. Moscoso.

█ At this point, because this Court and the parties considered it to be a question of law to be decided in this matter, a brief discussion of the burdens of proof required will be considered even though this court has held that the higher standard has been met. The claimants place great reliance on the case of *Ivers v. United States,* 413 F.Supp. 394 (N.D.Cal.1975) and *U. S. v. One 1964 MG, Serial No. 64GHN3L34408,* 408 F.Supp. 1025 (W.D.Wash.1976). Claimants cite as authority a portion of the findings in *U. S. v. One 1964 MG, Serial No. 64GHN3L34408,* at p. 1028 where that Court stated:

> the court agrees with the government that 19 U.S.C.A. § 1602 *et seq.* is inapplicable here because monetary instruments were seized under authority of 31 U.S.C.A. § 1102. In addition, these claimants have no standing upon which to object to forfeiture of the MG which was seized, pursuant to § 1602 *et seq.* However, the Court believes that the claimants' contentions raised with respect to 19 U.S.C.A. § 1602 *et seq.* are generally applicable to 31 U.S.C.A. § 1102.

This Court fails to see how this discussion is determinative of the burden of proof. Basically, that Court was concerned with the "due process" problem involving 19 U.S.C. § 1602 and not with the burden of proof pursuant to 19 U.S.C. § 1615. Likewise, claimant's reliance of *Ivers v. U. S., supra* is, in this Court's opinion, misplaced. The question of burden of proof required to sustain actions pursuant to 31 U.S.C. § 1102 was never directly discussed. It is not this

Court's opinion that, as the claimant contends, the placing of the lesser burden of proof on the Government would in any way relieve the Government of fully proving and sustaining their case. The Government is always required to prove each and every element of the violation, however, in cases such as these, the lesser burden of proving the case by the standard of reasonable cause to believe is sufficient. The Courts have long recognized the extreme burden placed on the Customs Service in enforcing the laws relating to importations along the borders. *Rubin v. United States,* 289 F.2d 195 (5th Cir. 1961).

> By the 71st section of the Duty-Collection Act of 1799, chap. 128, the onus probani to establish the innocence of the property is thrown upon the claimant in all cases where probable cause is shown for the seizure and prosecution. *Taylor et al. v. U. S.,* 3 How. 197, 205, 44 U.S. 197, 205, 11 L.Ed. 529 (1845).

And the burden of proof contained in 19 U.S.C. § 1615 has not been limited to violations of Title 19, United States Code, but has been applied to such diverse statutes as 22 U.S.C. § 401, *Rubin v. United States, supra* and *Bush v. U. S.,* 389 F.2d 485 (5th Cir. 1968); 49 U.S.C. § 781, *U. S. v. One (1) Chevrolet Corvette Automobile,* 496 F.2d 210 (5th Cir. 1974); 21 U.S.C. § 881, *U. S. v. One 1974 Cadillac Eldorado Sedan,* 548 F.2d 421 (2d Cir. 1977). Therefore, although the United States has proven this case by a preponderance of the evidence, the proper standard of proof to be applied in these matters is a reasonable cause to believe or probable cause to believe that the acts occurred.

▮ Further, the law requires that if an excess of Five Thousand Dollars ($5,000) in currency is brought into the United States from a place outside the United States, a Form 4790, Report of International Transportation of Currency or Monetary Instruments, must be filed. The Court finds that such a report was required in this matter. Further the Court finds that no report was filed or attempted to be filed regarding the transportation of this currency. The Court therefore concludes that there was probable cause for the seizure, the Government legally had possession of the currency and under the circumstances, lacking any valid affirmative defense by the claimants, the money should be and it is forfeited to the United States.

### c. Standing of Claimants

This Court has held that Mr. Bonilla-Restrepo was not the owner of the defendant currency. On June 5, 1975, he made statement upon statement against interest regarding the ownership of the currency. He explicitly and continually denied any interest in the currency. Mr. Bonilla has given contradictory statements in about equal numbers, first saying he had no interest or no claim in the money and, then later claiming an unspecified interest in the money. There has been no explanation regarding how an itinerant, out-of-work waiter might have acquired such a sizeable sum. As to the claims in the affidavit and subsequent assignment, the claimant Moran testified that Bonilla would have done and said anything to get out of jail.

▮▮ Therefore, there was no valid assignment of the currency as the assignor had nothing to assign. Since the assignee acquires only the interest of the assignor, *Florida Bahama Lines, Ltd. v. Steel Barge "Star 800" of Nassau,* 433 F.2d 1243 (5th Cir. 1970), in this case the claimants have acquired, and this Court holds that they have, no valid interest in the currency or this matter. As a matter of fact and law the claimants have no standing in this matter and lack a sufficient interest to be considered a real party in interest.

▮ Additionally, the claimants have claimed that they have been denied due process as a result of some delay on the part of the Government. First, because the Court has held the plaintiff's lack standing to contest the matter, the claimants have no constitutional rights in this matter which they may claim have been violated. However, assuming arguendo that the claimants had an interest in this matter, the fact that the seizure was made on June 5, 1975 and

the complaint was filed on May 17, 1976 lends no support to the claim of prejudice and as such the claimants have failed to show a denial of due process.

### d. Segregation of the First $5,000 of Currency as Not Subject to Forfeiture

The Court is left with a single remaining issue to be decided before the case may be finally disposed of. It is the contention of the claimants that, as claimants, they are entitled to the first $5,000 of currency as being beyond the forfeiture provisions of the Currency & Monetary Instruments Reporting Act, 31 U.S.C. § 1101, *et seq.* This Court has held that the claimants have no right to or interest in any part of the currency.

In order to properly decide this question a brief review of the statutes and regulations is required. Forfeiture is provided for pursuant to 31 U.S.C. § 1102(a) which provides:

Any monetary instruments which are in the process of any transportation with respect to which any report required to be filed under section 1101(a) of this title either has not been filed or contains material omissions or misstatements are subject to seizure and forfeiture to the United States.

And 31 U.S.C. § 1101 referred to hereinabove provides:

(a) Except as provided in subsection (c) of this section, whoever, whether as principal, agent, or bailee, or by an agent or bailee, knowingly—

(1) transports or causes to be transported monetary instruments—

(A) from any place within the United States to or through any place outside the United States, or

(B) to any place within the United States from or through any place outside the United States, or

(2) receives monetary instruments at the termination of their transportation to the United States from or through any place outside the United States in an amount exceeding $5,000 on any one occasion shall file a report or reports in accordance with subsection (b) of this section.

(b) Reports required under this section shall be filed at such times and places, and may contain such of the following information, in such form and in such detail, as the Secretary may require:

(1) The legal capacity in which the person filing the report is acting with respect to the monetary instruments transported.

(2) The origin, destination, and route of the transportation.

(3) Where the monetary instruments are not legally and beneficially owned by the person transporting the same, or are transported for any purpose other than the use in his own behalf of the person transporting the same, the identities of the person from whom the monetary instruments are received, or to whom they are to be delivered, or both.

(4) The amounts and types of monetary instruments transported.

(c) Subsection (a) of this section does not apply to any common carrier of passengers in respect of monetary instruments in the possession of its passengers, nor to any common carrier of goods in respect of shipments of monetary instruments not declared to be such by the shipper.

Special attention must be paid to 31 U.S.C. § 1101(b)(4) which provides that the amounts and types of monetary instruments transported are to be reported. Further, the regulations contained in 31 CFR § 103.48 provides in pertinent part:

Any currency or monetary instruments which are in the process of any transportation with respect to which a report is required under 103.23 are subject to seizure and forfeiture to the United States if such report has not been filed as required. . . .

Neither the statute nor the enacting regulations provides for the non-forfeiture of the first $5,000 in reportable currency. It appears that on any occasion where in excess

of $5,000 is being transported the whole amount is subject to reporting and the statutes and regulations provide that all instruments required to be reported which are not reported are, in fact, subject to forfeiture.

Since the full amount becomes subject to reporting, the statute provides that the reportable instruments are subject to forfeiture. The $5,000 establishes when the report is required and bears no relation to the forfeiture action. The *full* amount must be reported and consequently it is this amount that is forfeitable. Applying the rule proposed by claimants could lead to absurd results. As an example, if $5,100 in currency were transported without a proper report, claimant would contend that the government's action is limited to $100, and that $5,000 would be "up for grabs."

Examples of how the claimant's rule would become unusable are many and varied. In conclusion, it is the decision of this Court that, having found the currency or instrument to have been transported and subsequently not reported in violation of 31 U.S.C. § 1101 *et seq.* the whole amount becomes and is forfeited to the United States.

### HOLDING

Upon consideration of the evidence adduced at trial and the memoranda of the parties, the Court is of the opinion that there was probable cause for the seizure of the currency; that the United States has proven by a preponderance of the evidence that the currency was transported from a place outside the United States to a place within the United States and therefore subject to the reporting requirements of 31 U.S.C. § 1101 *et seq.* and 31 CFR 103.11. In addition, the United States has clearly shown by more than a preponderance of the evidence that no such report was filed. This having been proven, the currency in the full amount has been and is forfeited to the United States subject to any defenses of the claimants. The Court is further of the opinion that the facts have clearly shown that the claimants have proven no valid interest in this currency and further

have presented no defense to the forfeiture of the currency even in the event that they had some interest. The plaintiff having prevailed on all issues, the Court is of the opinion that the $11,580 should be forfeited.

Accordingly, it is

ORDERED:

1. That the $11,580 is hereby forfeited for the plaintiff, United States of America in the full amount.

2. That the Clerk is directed to enter judgment and tax costs accordingly.

3. That the amount of $11,580 be turned over to the District Director of Customs, Tampa, Florida, or his authorized representative for disposition according to law.

IT IS SO ORDERED.