551 F.Supp. 314 (1982)
UNITED STATES of America
v.
FOUR MILLION TWO HUNDRED AND FIFTY-FIVE THOUSAND, SIX HUNDRED AND TWENTY-FIVE DOLLARS AND THIRTY-NINE CENTS, etc.
UNITED STATES of America
v.
THREE MILLION SIX HUNDRED EIGHTY-SIX THOUSAND, SIX HUNDRED THIRTY-NINE DOLLARS, etc.
Nos. 81-1867-Civ-JLK, 81-1868-Civ-JLK.
United States District Court, S.D. Florida.
November 10, 1982.
*315 Gregory Baldwin and Joseph A. Florio, Asst. U.S. Attys., Miami, Fla., for plaintiff.
Raymond J. Takiff, Coral Gables, Fla., for defendant.

*316 FINDINGS OF FACT AND CONCLUSIONS OF LAW
BEER, District Judge.
This matter came on for trial on September 20, 1982, before the court without a jury. Trial continued each working day through September 27, 1982. Thereafter, written briefs were filed and, on the court's motion, oral argument took place in open court in Miami on October 29, 1982.
To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

Findings of Fact
1. These are civil forfeiture actions which the government has filed against Four Million Two Hundred Fifty-Five Thousand Six Hundred and Twenty-Five Dollars and Thirty-Nine Cents ($4,255,625.39), on deposit at Capital Bank in account number XXXXXXXXXX in the name of Sonal, and against Three Million Six Hundred Eighty-Six Thousand Six Hundred Thirty-Nine Dollars ($3,686,639.00), in U.S. currency. The two actions have been consolidated for all purposes, including trial.
2. This court has jurisdiction.
3. Viajes Atlas is a travel agency with an office in Cali, Colombia, operated by, among others, Beno Ghitis, a citizen and resident of Cali, Colombia.
4. In conjunction with the travel agency business noted above, Ghitis and others also operated a money exchange business.
5. In connection with operating the money exchange business, the operators made use of an entity referred to as Sonal. That entity, as will be more particularly discussed, obtained United States dollars and, thereafter, deposited those dollars in their bank account number XXXXXXXXXX with Capital Bank in Miami, Florida.
6. The Sonal account at the Capital Bank in Miami, Florida, was opened in March, 1980. The signatories on that account were Beno Ghitis, Sonia Ghitis and Alter (Abraham) Ghitis.
7. At the time of the opening of the Sonal account, Capital Bank originally charged a service fee of 1/8 of 1% of the total of the dollar deposits made by Sonal each month. This monthly service fee was paid on a monthly basis and, as will be noted hereafter, ranged upward to six figure amounts.
8. From March, 1980 through about April or May, 1980, large cash deposits were made into the Sonal account. These deposits were, in large part, actually carried into the bank for deposit by individuals who were, more likely than not, from the nation of Colombia.
9. Certain of the deposits into the Sonal account between March, 1980 and April or May, 1980 were cash deposits in amounts ranging up to $1,000,000. These deposits were, in most instances, in small denominations (5's, 10's, 20's, 50's and 100's). Such deposits were sometimes made within a day or two or three of each other and were counted at the bank by bank employees who usually made their count in the presence of the individuals who delivered it to the bank.
10. Some time in April or May, 1980, one Victor Eisenstein introduced himself to Capital Bank branch manager Rolando Pozo as the person who would make deposits into the Sonal account from that time onward.
11. Eisenstein had been employed by Ghitis (at a salary of approximately $1,500.00 per month) to receive and, thereafter, to deposit dollars into the Sonal account at Capital Bank.
12. Eisenstein subsequently was present at the bank to introduce Ghitis to Capital Bank president Abel Holtz. Ghitis and Holtz met, thereafter, to deal with matters regarding the Sonal account.
13. Then, in May, 1980, Capital Bank branch manager Pozo refused to accept any more cash deposits into the Sonal account from Eisenstein.
14. Very quickly after Eisenstein was advised that cash deposits would no longer be accepted for the Sonal account, Ghitis met with Pozo who reaffirmed that cash *317 deposits by Sonal would not be accepted. This led very quickly to a meeting between Holtz, Capital's president, and Ghitis wherein it was agreed that Capital Bank would again accept cash deposits into the Sonal account. However, the bank fees for so accepting were raised to ½ of 1% of the dollar deposits made into the account each month.
15. Accordingly, cash deposits again were made in the Sonal account by Eisenstein. These deposits continued to be made at the rate of two or three times per week and in amounts ranging from $1 to $2 million per deposit until July, 1980. These cash deposits by Eisenstein were usually delivered to the bank's branch office in suitcases, duffle bags or flight bags.
16. Commencing in late July or early August, 1980, the cash deposits in the Sonal account, which had, until then, been made at the downtown branch of Capital Bank, were, thereafter, made at the North Bay Village branch of the bank.
17. From late July or early August, 1980 until August 21, 1981, Eisenstein continued to be the principal physical depositor of cash into the Sonal account at the North Bay Village branch. In August of 1980, Eisenstein moved the office from which he operated to the building which also housed the North Bay Village branch of the Capital Bank. He continued to receive cash which he then, forthwith, deposited into the Sonal account. Eisenstein would usually bring the cash to a particular room used by the Capital Bank for counting purposes.
18. The cash above described was then counted by the bank, using a money counting machine which had been purchased by Sonal for the bank's use.
19. In March, 1981, Eisenstein apparently became concerned about the source and origin of the cash he was physically receiving and depositing into the Sonal account. These concerns were expressed to Ghitis who, thereupon, transmitted a letter to Eisenstein dated March 7, 1981, from Cali, Colombia. In that letter, Ghitis advised: "The monies received by us in the U.S. are in connection with exchange transactions from (as far as we know) the exporting and importing of agricultural products, raw materials, etc., sales commissions and other categories, received abroad by private individuals who are primarily from our country." (Emphasis mine.)
20. Sonal's records apparently identify various individuals from whom dollars were allegedly purchased. All are Colombians, none of whom maintains offices in the State of Florida, none of whom are licensed, incorporated or registered to do business in the State of Florida and none of whom are noted in records maintained by the U.S. Customs Service as having imported or exported materials into or out of the United States.
21. Yet, these transactions form the alleged legitimate basis (according to Sonal's representative) for the cash deposits of $242,238,739.00 in the Sonal account (via Eisenstein) between January 1, 1981 and August 21, 1981  a period of less than eight months.
22. The agent of one of these "private individuals" was identified as "Alberto" who was responsible for deliveries (via Eisenstein) of over $191,000,000 in cash between January 1 and August 20, 1981. These funds were earmarked for the Sonal's account in the name of Carlos Molina.
23. Carlos Molina apparently does his various business activities from a Colombian base. His representative, "Alberto," apparently is not a resident of the United States.
24. In August, 1981, cash in excess of $2,000,000 was delivered to Eisenstein by "Alberto" (who may, as will hereafter be discussed, also be one "Toro"). Among the boxes of cash delivered by Alberto to Eisenstein was one box which, when first unsealed at the U.S. Customs Office in Miami on the night of August 20, contained a Colombian newspaper, "El Colombiano," dated August 17, 1981.
25. Among the items delivered to Victor Eisenstein on August 20, 1981 was a parcel of cash. That parcel contained a check dated "Julio 14, 1981" payable to the bearer *318 in the amount of $32,000. That parcel was delivered by "Alberto" who was acting for Carlos Molina. The check was drawn on an account owned by Export Car, Inc., an import-export business located in Miami, owned and operated by Gustavo and Diego Londano, Colombian citizens. Diego Londano resides in Colombia.
26. Between August 18 and August 20, 1981, the identities of various couriers who delivered money to Eisenstein were sought to be obtained by Eisenstein at the request of U.S. Customs Agents. Some couriers were apparently identified by Eisenstein. Each of those identified presented Colombian identification (passports, cedulas or Colombian driver's licenses).
27. I conclude that the couriers who brought the above noted cash to Eisenstein were Colombian people who had recently arrived from Colombia with the cash.
28. A Currency Transaction Report (IRS Form 4789) is required to be filed by all primary and secondary financial institutions involved in transactions which receipt or deposit currency in excess of $10,000 in cash. These forms are required to be mailed to the IRS in Ogden, Utah.
29. Eisenstein, acting for Sonal as receiver of the large amounts of cash to be deposited into the Sonal account at Capital Bank, was obliged to file Form 4789 for each receipt of cash in excess of $10,000. I conclude that Eisenstein was or should have been sufficiently aware of this requirement as to obviate any reasonable misunderstanding about the requirements for same at least from March, 1981 onward.
30. A Report of International Transportation of Currency or Monetary Instruments, Customs Form 4790, must be filed by persons who transport or cause to be transported currency or monetary instruments from a place outside the United States to a place inside the United States in excess of $5,000. Customs Form 4790 must also be filed by the person who actually transports such currency or monetary instrument into the United States from outside the United States. Banking institutions are also required to file Form 4790 when they have reason to believe that currency in excess of $5,000 has been transported from a place outside the United States to a place inside the United States, and a Form 4790 has not already been filed.
31. The Forms 4790 with which we are here concerned are to be filled out and filed with the U.S. Customs Service in Washington, D.C., or the U.S. Customs Service in Miami, Florida.
32. Instructions for the preparation, purpose and use of Forms 4789 and 4790 appear on the reverse side of each form.
33. Neither Ghitis, Eisenstein nor any courier or agent filed Form 4790 to cover any of the cash received by Eisenstein in Miami.
34. In April, 1981, Capital Bank ceased filing Forms 4789 on the cash deposits into the Sonal account and commenced filing Forms 4790 on those deposits. Forms 4790 were filed for those deposits through August, 1981 by the Capital Bank.
35. The Forms 4790 filed by Capital Bank on the Sonal cash deposits were incomplete and failed to state the foreign country from which the cash was being exported to the U.S. Furthermore, the Forms 4790 were not sent to the U.S. Customs Service in Washington, D.C., or Miami, Florida, as required, but, instead, were routed to the IRS in Ogden, Utah. Why Capital Bank proceeded in this particular manner is unclear to me.
36. Beno Ghitis, Sonia Ghitis and Alter Ghitis had filed Forms 4790 in prior years concerning the importation of cash from Colombia into the U.S. (not relating to the Sonal account) and, thus, I find it reasonable to conclude that they were familiar with the reporting requirements noted above.
37. On March 7, 1981, Ghitis advised Eisenstein: "Even though some of these transactions involved the handling of cash, they do not give rise to mistaken associations with illegal operations which are so fashionable these days in Florida."
38. This effort to reassure Eisenstein appears to be consistent with concerns on *319 the part of Ghitis who feared that the Sonal account might be subject to seizure. Ghitis obviously expressed this concern in a discussion with Pozo and Holtz when he proposed special arrangements with the Capital Bank through which the Sonal account might possibly avoid seizure by the government. The Capital Bank, acting through Holtz, was unresponsive to this proposal. I conclude that the discussions here noted were precipitated by concerns on the part of Ghitis which transcended his fears in behalf of holders of Sonal checks and indicated a tacit acknowledgement of his disquieting belief that these large cash deposits were coming to the Sonal depositor (Eisenstein) by way of Colombian couriers carrying narcotic-generated cash. I further conclude that the proposal suggested by Ghitis was either known to him to be  or that he reasonably should have known it to be  improper and, possibly, fraudulent.
39. Ghitis, on behalf of Sonal, did attempt to have Capital Bank officials arrange a meeting between Sonal (Ghitis) and government agents, but he did not directly contact or attempt to contact government agents. I am unable to conclude that this attempt indicates good faith on the part of Ghitis. To the contrary, I believe that Ghitis had a continuing and serious concern about seizure based upon a gnawing belief that the funds being dealt with were tainted.
40. In August, 1981, Ghitis advised Eisenstein and Agent Fernandez that he would come to the United States to discuss the Sonal account if he received assurances that he would not be arrested. A short time prior to these developments, Holtz and Ghitis had discussed the large amounts of cash being regularly deposited into the Sonal account. Holtz expressed concern over Capital Bank's "exposure" under such circumstances. Ghitis denied any drug connections but voiced his suspicion that the U.S. currency he was dealing with could have some involvement in drug transactions.
41. Subsequently, Capital Bank increased its "fee" on the Sonal account from ½ of 1% to a flat fee of $300,000.00 per month, payable at the rate of $150,000.00 on the first and fifteenth days of each month. The imposition of this flat fee was made retroactive to May 1, 1981, and remained in effect through August 21, 1981. Annualized, this would generate a "fee" from Sonal to Capital in the amount of $3,600,000 per year.
42. The volume, frequency and complexion of the cash transactions involving Sonal-Capital reasonably gave rise-in my view-to the association of the cash being deposited into the Sonal account with drug transactions.
43. Eisenstein and Ghitis were reasonably aware, or should have been aware, at pertinent times that the origin and source of the large cash deposits into the Sonal account were from proceeds of narcotics transactions.
44. Ghitis was acquainted with two of the 29 Colombians from whom he allegedly purchased dollars. He apparently knew of Carlos Molina and relied (however improvidently) upon his questionable belief that Molina's general reputation required no affirmative acts on the part of Ghitis to look into the origin or source of the cash sold to him by Molina.
45. Subsequent to Eisenstein's receipt of Ghitis' March 7, 1981 letter, Eisenstein drafted and mailed a letter of resignation but handled same in a strange and unexplainable way: He mailed the original letter of resignation to himself, and turned this letter over to U.S. Customs Agent Robert Fernandez in the original sealed envelope on or about August 17, 1981. Eisenstein explained to Agent Fernandez that he had mailed the original letter of resignation to himself in an effort to "protect" himself.
46. In August, 1981, Eisenstein, apparently in a state of considerable nervous agitation, agreed to cooperate with the U.S. Customs Service in its investigation of the origin and source of the cash deposits being made by him into the Sonal account.
47. As a result of this, U.S. Customs Agents listened in on a telephone conversation *320 between Eisenstein and Ghitis, had access to Eisenstein's office located in the same building as the Capital Bank North Bay Village branch and participated in the receipt of certain cash deliveries to Eisenstein at that office.
48. During August 19 and 20, 1981, $7,012,799 in cash, consisting, to a significant degree, of small and medium denomination bills, was delivered to Eisenstein's office for deposit into the Sonal account.
49. Eisenstein's office located on the fourth floor of the same building housing the Capital Bank North Bay Village branch, and known as "American Overseas Enterprises," had no guards, security devices or special locking mechanisms except a standard door lock, and no safes or vaults for the storage of cash.
50. The cash delivered to Eisenstein on August 19 and 20, 1981, was delivered in brown cardboard boxes, brown paper parcels and various types of travel bags, flight bags and duffle bags.
51. The couriers who delivered the currency to Eisenstein were unwilling to accept receipts for the delivery of the currency.
52. Of the $7,012,799 in cash delivered on August 19 and 20, 1981, $4,781,799 cash was delivered to Eisenstein by "Alberto Rodriguez" and "Hector Gomez" on behalf of Carlos Molina.
53. On August 19, 1981, Eisenstein deposited into the Sonal account at Capital Bank $1,313,000 of the cash delivered by "Alberto Rodriguez," and $844,000 cash delivered by "Brigitte Edelman."
54. A large amount of the cash delivered to Eisenstein's office on August 19, 1981, was left overnight in Eisenstein's office in the boxes and parcels described above.
55. I conclude that the cash delivered to and thereafter deposited by Eisenstein on August 19 and 20 was, more likely than not, derived from transactions which, in substantial if not exclusive part, actually took place, insofar as the physical transaction was concerned, in Colombia.
56. The $4,781,799 cash delivered to Eisenstein on August 19 and 20, 1981, was brought to the vicinity of Eisenstein's office by, and removed from the trunk of, a maroon 1981 Chevrolet Caprice, Florida license UXB 390.
57. On August 19, 1981, "Alberto Rodriguez" purchased a one way ticket on Avianca Airlines flight 65 bound from Miami to Colombia on September 2, 1981, and paid $274.00 cash for it.
58. "Alberto Rodriguez" used the name "Carlos Toro" in purchasing the Avianca ticket on August 19, 1981.
59. The Florida driver's license for Carlos Toro bears the photograph of Alberto Rodriguez.
60. The residence address of Carlos Toro reflected on the Florida driver's license is a false residence address. In delivering the cash to Eisenstein on August 19 and 20, "Rodriguez" (Toro) showed Eisenstein Colombian identification.
61. On August 20, 1981, "Alberto Rodriguez" and "Hector Gomez" went to the Avianca Airlines ticket office.
62. On August 20, 1981, the driver of the 1981 Chevrolet Caprice bearing Florida license UXB 390 lost effective control over the vehicle in Miami Beach when it was towed to the local "pound" because of improper parking. This event was essentially the result of the reporting of the improper parking to the appropriate local police department by the government agents who had these individuals under continuing surveillance.
63. Subsequent to these events, two Avianca Airlines tickets were found in the glove compartment of that vehicle; these tickets reflect that they were purchased on August 18, 1981, for a one way flight from Miami, Florida, to Medellin, Colombia. On August 20, 1981, a reservation for Avianca flight 67, leaving August 29, was made; the tickets bear the names "Hector Gomez" and "Gilberto Rua."
64. Sonal's own records indicate that "Alberto" delivered (to Eisenstein) over $191,000,000 cash "purchased" from Carlos *321 Molina. Carlos Molina is, apparently among other things, a Colombian money exchanger residing and doing business in Colombia.
65. On August 19, 1981, Eisenstein introduced Customs Agent Fernandez to Alberto Rodriguez at Eisenstein's office, and Fernandez, acting in an undercover capacity, assisted Eisenstein in unloading boxes containing cash from the 1981 Chevrolet Caprice.
66. Subsequent to the making of several telephone calls by Alberto Rodriguez on August 20, Ghitis then was the initiating caller in a telephone conversation with Eisenstein (during the evening of August 20) which was monitored by Customs Agent Fernandez.
67. During that telephone conversation, Ghitis told Eisenstein that "Alberto" knew that Eisenstein "was with Customs."
68. During that telephone conversation, Ghitis instructed Eisenstein to make no further deposits of cash in the Sonal account.
69. The Avianca ticket purchased by Alberto Rodriguez for the September 2 flight 65 from Miami to Colombia was apparently not used by Rodriguez on September 2, 1981, and neither Rodriguez's name nor the name Carlos Toro appeared on the flight manifest or passenger list for that flight.
70. The 1981 Chevrolet Caprice which was towed to be impounded by the local police on August 20, 1981, contained a compartment behind the rear seat which was opened by a switch beneath the driver's seat.
71. During the evening of August 20, 1981, Eisenstein did not interfere with government agents who removed from his office, among other things, one brown paper package, one brown paper bag and four brown cardboard boxes which contained cash in the amount of $3,686,639.
72. Also among the items removed from Eisenstein's office and taken to the Customs office were various containers apparently used on prior dates for the delivery of cash to Eisenstein, including duffel bags, a suitcase, a Samonsite hand travel bag, a Samonsite flight bag and several brown cardboard boxes.
73. On August 21, 1981, at Miami, Florida, pursuant to a seizure warrant issued by U.S. Magistrate Shapiro, agents of the U.S. Customs Service seized $4,255,625.39 contained in Capital Bank account number XXXXXXXXXX in the name of Sonal.
74. At the conclusion of the government's case in chief, I saw fit to confirm the magistrate's finding of probable cause which formed the basis for the seizure of the $4,255,625.39 contained in the Capital Bank account number XXXXXXXXXX in the name of Sonal, as well as the Custom Agents' seizure of the cash above described.
75. None of the individuals nor business entities who sold currency to the Sonal office in Colombia testified in these proceedings.
76. None of the individuals who delivered currency to Eisenstein for deposit into the Sonal account testified in these proceedings.
77. Gustavo Londono, a Colombian citizen, did testify. He identified the blank check for $32,000 dated "Julio 14, 1981," found in a parcel delivered to Eisenstein by "Alberto." The check, then completely blank, had apparently been stolen from his car in Miami, Florida, around April, 1981, along with his briefcase. The check had been forged. Londono had neither reported the theft of the check(s) nor briefcase to the police.
78. The $3,686,639.00 in U.S. currency and the cash which formed the basis for the $4,255,625.39 contained in Capital Bank account number XXXXXXXXXX in the name of Sonal was, I conclude, in large measure, located in Colombia and, thereafter, imported and delivered to Eisenstein at Miami, Florida.
79. The cash was the subject matter of purchases by Ghitis in behalf of Sonal. These purchases caused various Colombians who were physically holding the cash to ship (or cause to be shipped) the cash itself into the United States and specifically to Eisenstein, in Miami, Florida, for him to *322 make the deposit of same into the Sonal account. Customs Form 4790 was not filed by the shipper, courier or receiver of the currencies. It is unreasonable to conclude that these cash shipments were transported into the United States in individual shipments of less than $5,000.00.
80. The $3,686,639 in U.S. currency and the $4,255,625.39 contained in Capital Bank account number XXXXXXXXXX in the name of Sonal were funds which I conclude were, more likely than not, traceable to exchanges for controlled substances. Thus, I conclude that Ghitis, acting in behalf of Sonal, failed to take such reasonable precautions as should have been taken to determine that the currency  purchased in the course of his negotiations in Colombia  was untainted by narcotics transactions. Specifically, I conclude that every principal actor in this drama  Ghitis, Holtz, Eisenstein and Molina, knew or reasonably should have known that the cash that is the subject matter of the seizures we here deal with was drug tainted. I further conclude that the cash itself was  if not exclusively then at least in large measure  actually transported at the instance of Molina and others from foreign locations  principally the country of Colombia  to Miami and, thereupon, to Eisenstein as Sonal's designated receiver. I further conclude that the Sonal operation necessarily charged fees that would see to the underwriting of the exhorbitant fees Sonal was charged by Capital Bank and that both these fees actually covered the "going rate" for laundering of these funds by ostensibly legitimate institutions who  for large fees  sought to legitimize the funds by passing them through their operation. I conclude that Ghitis, as operator of Sonal, did not engage in personal involvement in drug transactions. Nor am I able to conclude that, for example, Molina personally involved himself in drug transactions. Even so, I am convinced that the cash came from drug sales and, in large measure at least, found its way to Colombia-based drug operators who, thereupon, sought to launder the cash by "passing it through" a reasonably reputable money exchange house  here, Sonal via Molina.
I conclude that the great bulk of the cash that we are here concerned with followed this basic route:
1. A street transaction for drugs. 2. Into the hands of a drug dealer in the U.S. 3. Into the hands of a drug producer in Colombia. 4. "Sold" at a discount by the Colombian drug producer to, for example, Molina who, in return for getting the cash at least part of the way back into the quasi-legitimate mainstream, "discounts" at a rate based upon what the traffic will bear. 5. "Sold" at a more stable discount rate by Molina to Sonal with the obligation to make the physical delivery to Sonal's Miami "office" (Eisenstein). 6. Deposited by Sonal in its account but earmarked as funds of Molina so that Sonal checks could be drawn at Molina's instructions to them.
Thus, Molina  the real crossover contact  could, with impunity, direct Sonal checks to receivers. Those checks could arrive anywhere in the world in any amount and be fully accepted due to Sonal's so-called good name.
That's what it all looks like to me.
81. The government called several witnesses and adduced various testimony to show or attempt to show that an actual narcotics smell accompanied the cash, prevailed in the Chevrolet described earlier, and permeated the bags and containers used to haul the cash around. This was interesting and innovative but unconvincing, and I am not able to conclude that the money was actually physically tainted.
82. The taint that I do find is, then, a circumstantial conclusion based upon my factual findings in accordance with the preponderance of all the evidence. I note this so that any reviewing court may lose no time in finding the basis for my decision.

Conclusions of Law
1. In a civil forfeiture proceeding pursuant to 21 U.S.C. § 881(a)(6), the government has the initial burden of showing "probable cause" to support its contention that the property was used illegally. *323 21 U.S.C. § 881(d); 19 U.S.C. § 1615; United States v. One 1975 Ford F-100 Pickup Truck, 558 F.2d 755 (5th Cir.1977).
2. Probable cause exists when the facts are of such a nature as to support a reasonable belief that a statute has been violated. United States v. One 1949 Pontiac Sedan, 194 F.2d 756, 759 (7th Cir.1952); Ted's Motors v. United States, 217 F.2d 777 (8th Cir.1954).
3. In a civil forfeiture action pursuant to 21 U.S.C. § 881(a)(6), a direct or substantial connection between the property subject to forfeiture and the underlying criminal activity which that statute seeks to prevent may not be required if facts and circumstances would lead a reasonable fact finder to believe that a crime was committed and that the res subject to the forfeiture was connected with that commission. United States v. $364,960 in United States Currency, 661 F.2d 319 (5th Cir.1981).
4. If the government succeeds in demonstrating probable cause to the fact finder, the burden to then go forward with additional proof appears to shift, so that the claiming party then has the burden to show by a preponderance of the evidence that the property was not used illegally. 19 U.S.C. § 1615; 21 U.S.C. § 885; United States v. One 1969 Plymouth Fury, 476 F.2d 960 (5th Cir.1973); United States v. $83,320 in United States Currency, 682 F.2d 573 (6th Cir. 1982); United States v. One 1975 Ford F-100 Pickup Truck, supra; United States v. $10,000 in United States Currency, 521 F.Supp. 1253 (N.D.Ill.1981).
5. The statutory language of 21 U.S.C. § 881(a)(6) states that "no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act of omission established by that owner to have been committed or omitted without the knowledge or consent of that owner." Thus, the claimant Ghitis (in behalf of Sonal) could bring about the dissolution of the seizure even if the government succeeds in establishing probable cause in the view of the fact finder by showing that Sonal had no knowledge and had given no consent to improper acts or omissions. Ea Shipping Co. v. Bazemore, 617 F.2d 136 (5th Cir.1980).
6. Where it is reasonable to believe that an owner of property is aware that the property is the proceeds of narcotics transactions or involved in the narcotics exchange business, that owner is not an innocent owner. See United States v. One Tintoretto Painting, 527 F.Supp. 1071, 1073 (S.D.N.Y.1981); Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 690, 94 S.Ct. 2080, 2095, 40 L.Ed.2d 452 (1974).
7. Based upon the facts and circumstances of this case, and upon the inferences reasonably drawn therefrom, the government has shown probable cause to believe that the currencies violated 21 U.S.C. § 881(a)(6) and should be forfeited to the United States.
8. The government having established probable cause, the burden of proof shifted to the claimant. The claimant has failed to show by a preponderance of the evidence that either of the currencies are not in violation of 21 U.S.C. § 881(a)(6). Sonal and Ghitis have failed to establish that they are innocent owners of either of the currencies.
9. In a civil forfeiture proceeding pursuant to 31 U.S.C. § 1101 et seq, the government has the initial burden of showing probable cause to support its belief that the property was used illegally. 19 U.S.C. § 1615; United States v. $11,580 in United States Currency, 454 F.Supp. 376 (M.D.Fla. 1978).
10. Probable cause has been shown when the facts are of such a nature as to support a reasonable belief of a violation of the statute. See United States v. One 1949 Pontiac Sedan, 194 F.2d 756, 759 (7th Cir.1952); Ted's Motors v. United States, 217 F.2d 777 (8th Cir.1954). Probable cause is defined as facts and circumstances which would lead (by inferences) a prudent person to believe that a crime was committed and that the subject of the investigation was connected with the crime. *324 United States v. One Twin Engine Beech Airplane, 533 F.2d 1106, 1107-08 (9th Cir. 1976). In civil forfeiture cases, circumstantial evidence may be used to show probable cause. United States v. $364,960 in United States Currency, 661 F.2d 319 (5th Cir. 1981).
11. Once the government shows probable cause, the burden of proof does not necessarily shift. The claiming party may attempt to show by a preponderance of the evidence that the property was not used illegally, 19 U.S.C. § 1615; United States v. $11,580 in United States Currency, 454 F.Supp. 376 (M.D.Fla.1978), and the government may attempt to show that it was.
12. In this connection, I have considered my factual findings from the standpoint of a tentative determination on my part that the measure that should be brought to my deliberations on this aspect of the case is as follows:
If there is a determination by the fact finder (me) that probable cause was demonstrated, then, at least insofar as 31 U.S.C. § 1101 et seq. is concerned, the "second step" should more properly place the burden of proof  by a preponderance of the credible evidence  on the government to demonstrate a set of circumstances that mandate forfeiture. With that more onerous test assumed to be the government's burden, I, nevertheless, find that forfeiture is, here, the proper result.
Going one step further and applying that same formula to the proceedings which took place as a result of the applicability of 21 U.S.C. § 881(a)(6), I, nevertheless, reach the same result.
Conclusions thus categorically stated certainly should be supported by reasoned explanation  or at least an attempt at same.
I feel such far reaching conclusions are supported by the record when it is considered in the light of the basic common sense and common experience that district judges are wont to seek from district court jurors.
Dade County and environs do not exist in a vacuum. It would be both unrealistic and a derogation of the common experience consideration that I am obligated to bring to my deliberations here if I did not take into account that Miami and environs have become a currency center for drug activities. At times pertinent, various laundering operations were the order of the day among those embarked upon far reaching drug activities. Indeed, an essential element of big time or big money drug operations is a reasonably dependable system of getting street drug dollars into useable bank accounts. What better way than via money exchange operations with some aura of legitimacy? Indeed, with only a little softening of traditional concepts of business morality and the violation of a few somewhat obscure federal statutes, a couple of not too cautious money exchange houses and a "fee" hungry bank could be (and in this case became) an ideal laundry system. No one needed to get really involved. It would only be necessary that no one be too inquisitive. Elaborate hopes could become almost immediate realities if "fees" could be charged commensurate with the need to have huge amounts of small denomination "dirty" cash laundered into neat, clean checking accounts able to be dispatched  with impunity  across the world.
But the parties (I conclude) overloaded the scheme, and it shorted out in the process. They went too far too fast and leaks sprung up which led eventually to the seizure with which we are here concerned.
I believe, for example, that Molina knew that most  if not all  of his $190,000,000 was street money  obtained in large measure on the streets of America but destined for final arrival in Colombia  an undisputed source of U.S. bound narcotics. As various individual shipments of cash arrived in Colombia (to pay for the drugs imported from Colombia) and as these cash payments accumulated in the drug providers' hands, it became necessary for these funds to achieve legitimate status in order to be useful in general commerce. U.S. cash in huge amounts and of small denomination is not, after all, very negotiable for many sorts of commercial activity  particularly in Colombia. *325 With the laundering operation in place in Miami, it was necessary to route the cash to Eisenstein and, thereby, to Sonal. Molina's couriers were used to do this. How they actually got the cash into Eisenstein's hands remains, to some extent, a mystery. In this regard, I cannot conscientiously conclude that every single bill came from Colombia. But I'm sufficiently convinced that the great bulk of the funds did come to Miami via Colombia in spite of Sonal's protestations to the effect that U.S. cash in large amounts and small denominations is a desirable commodity in Colombia.
It's possible that some of Molina's couriers (or others, for that matter) picked up some portion of these small bills in places other than Colombia  perhaps even in the United States  but the great weight of the evidence indicates otherwise. Molina's so-called money exchange house accounts for more than ¾ths of the total amount of cash that Sonal dealt with during the pertinent time period. It would have made a greater impression on a fact finder to have heard from Molina or his representative  under oath  than to hear (however interesting) an abstract discussion of money exchanges in Colombia since the coffee shortage that took place there approximately ten years ago.

CONCLUSION
Molina to Sonal to Capital Bank was, more likely than not, a money laundering process presided over by managers whose total drug contacts may very well have been no more than dealing with the business hereinabove described. Even so, I believe that the intent of the applicable statutes requires the forfeiture here sought.
The issues have been competently addressed by exceptionally able trial counsel on both sides. Indeed, they are entitled to have formal recognition taken of their professional excellence. I do that unhesitatingly.
Counsel for plaintiff is directed to prepare a judgment consistent with these findings.