[No. F023105. Fifth Dist. Dec. 3, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
$28,500 UNITED STATES CURRENCY, Defendant;
RAMON AGUILAR, Defendant and Appellant.

**COUNSEL**

Robert J. Beles and Paul McCarthy for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General,

Holly D. Wilkens and Jeffrey J. Koch, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

### ARDAIZ, P. J.—

#### FACTS AND PROCEDURAL HISTORY

Law enforcement officers seized $28,500 from the interior of Edwin Esqueda's truck following his arrest for driving under the influence on August 28, 1992.

On September 4, 1992, Ramon Aguilar filed a Health and Safety Code section 11488.5 claim with the Stanislaus Superior Court challenging the forfeiture of the money confiscated.[1]

On September 30, 1992, the People filed a complaint in the same action seeking forfeiture of the $28,500 pursuant to section 11470 et seq. The complaint listed Aguilar as the real party in interest and alleged that the money was seized from Esqueda following his arrest for driving under the influence. It listed the following factors as indicators that the money seized was related to a violation of possession for sale and/or sale of a controlled substance: the presence of a pager and cellular telephone in the truck; the large amount of money involved and the manner in which it was carried (in a brown paper bag which was inside a brown plastic bag), the small denominations of the bills confiscated; the canine alert to the money; and Esqueda's claimed lack of knowledge as to the owner of the money. The complaint specifically alleged that the money was subject to forfeiture under section 11470, subdivision (f) in that "the defendant property was furnished or intended to be furnished by a person in exchange for a controlled substance . . . ."

On October 16, 1992, Aguilar filed a verified answer to the complaint for forfeiture. In it, he denied that any of the statutory provisions for forfeiture alleged in the complaint applied. He acknowledged that he was not in a position to admit or deny the allegations in the complaint as to how the money was confiscated or its present location. Aguilar denied having provided Esqueda with the money in exchange for a controlled substance and

---

[1]This case is governed by the forfeiture statutes contained within the Health and Safety Code as they existed prior to the 1994 amendments. As such, the statutory references that follow are to the Health and Safety Code sections which predate the 1994 amendments unless otherwise noted.

claimed that he did not intend for Esqueda or anyone else to furnish the money to someone in exchange for a controlled substance. Aguilar also asserted that the canine alert and the other indicia of drug trafficking relied on by the prosecution "signif[y] nothing." Aguilar finally asserted that the complaint failed to state a cause of action upon which relief could be granted and that plaintiff lacked probable cause to forfeit the defendant property.

Aguilar also filed a motion pursuant to section 11488.4, subdivision (g)(1) seeking the return of his property following a determination that there was no probable cause to support the forfeiture. In support of his claim, he pointed to his lack of involvement in the drug business and his ability to legally account for Esqueda having such a large sum of money. He also argued that the canine alert evidence was inadmissible since the People could not lay an adequate foundation as to the dog's reliability.

In advancing this latter claim, Aguilar analogized the dog to an intoxilyzer. He then pointed out that before intoxilyzer evidence could be introduced at trial, the proponent of the evidence had to establish that the intoxilyzer was in proper working order; that the test was properly performed; and that the operator was qualified and competent. In contrast, he argued, the canine in question was not certified and no independent tests had been performed to verify his/her rate of accuracy in detecting only controlled substances. He maintained the method used by the drug-sniffing canine, Jon-Jon, bordered on the "esoteric, metaphysical, or spiritual."

In the alternative, Aguilar argued that the canine evidence in this case must satisfy the foundational requirements applicable to dog tracking evidence; namely, that the dog is reliable; that the dog was adequately trained in tracking; the dog's handler is qualified by training and experience to use the dog; the dog was placed on a track where other circumstances indicate the guilty party had been; and that the trail was not stale or contaminated. He insisted that no showing could be made as to the last two requirements.

Finally, he argued that, even if the dog's response was introduced into evidence, it was not entitled to any weight since, according to one study, nearly 96 percent of random bills tested in various cities throughout the United States tested positive for cocaine. Aguilar identified another study where money was obtained from banks and "other legal sources" by scientists in Pennsylvania who found cocaine on more than 80 percent of the bills tested. Aguilar claimed that, based on these findings, many courts have concluded that a dog alert, even if accompanied by evidence that the suspect matched a drug courier profile, was insufficient to establish probable cause to forfeit the money. In support of this last contention, Aguilar cited a number of federal district court cases.

The People filed a memorandum of points and authorities in support of a probable cause finding. They urged the trial court to apply the same standard employed in federal forfeiture proceedings since the state laws were fashioned after the federal laws. The People represented that the federal standard requires the governmental entity to show there is probable cause (less than a preponderance of the evidence but more than a reasonable suspicion) to forfeit the subject property. According to the People, if the government meets this burden, the claimant must then show by a preponderance of the evidence that the property is not subject to forfeiture. Relying on federal case authority, the People advised the trial court that it could consider hearsay evidence in making this determination. They then cited three federal cases which found the seized property subject to forfeiture under circumstances not unlike those of the case before us—*U.S.* v. *Padilla* (9th Cir. 1989) 888 F.2d 642; *U.S.* v. *U.S. Currency $83,310.78* (9th Cir. 1988) 851 F.2d 1231; *United States* v. *$2,500 in United States Currency* (2d Cir. 1982) 689 F.2d 10.

In responding to Aguilar's claims regarding admissibility of the canine search evidence, the People noted that there was no case authority for subjecting such evidence to what amounted to a *Kelly-Frye* (*People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 F. 1013 [54 App.D.C. 46, 34 A.L.R. 145]) analysis. The People also argued that the drug scent in this case was not stale in that the search was conducted within three hours of the traffic stop and that Aguilar has simply tried to distort the staleness issue by trying to link it to the time when the drugs came into contact with the contaminated money rather than the time at which the search was conducted. The People pointed out that one of the cases cited by Aguilar, *U.S.* v. *$87,375 in U.S. Currency* (D.N.J. 1989) 727 F.Supp. 155, not only acknowledged that probable cause could be supported by alerts and identifications of narcotic detection dogs but also rejected the contamination theory Aguilar advanced.

Declarations from the three law enforcement officers involved in this case were also offered in support of the People's position that probable cause existed. Those declarations revealed the following facts.

On August 28, 1992, at approximately 4 a.m., Stanislaus County Sheriff's Deputy Green watched as a blue step-side Chevrolet Silverado and a green Chevrolet Corvette traveled side by side on southbound Highway 99 at a high rate of speed. The officer drove his patrol car at speeds up to 115 miles per hour in his initially unsuccessful pursuit of these vehicles.

Another sheriff's deputy was able to stop the Corvette. As Deputy Green arrived at the scene of the stop, he noticed the Chevrolet truck parked

alongside Highway 99 with its lights off. The driver of the Corvette was identified as Francisco Fontana Montana (also known as Francisco Martin) with a date of birth of January 4, 1967. As Deputy Green spoke with the deputy who effectuated the stop, the lights of the pickup truck came on, the vehicle pulled out, passed the officers, and resumed traveling southbound on Highway 99.

Deputy Green got into his patrol car and stopped the pickup truck. The deputy contacted the driver of the vehicle, Edwin Esqueda, and observed him to be under the influence of alcohol. A California Highway Patrol officer was summoned and arrived on the scene a short time later.

Esqueda was ultimately arrested for driving under the influence. An inventory search of his 1991 truck conducted at the scene revealed a bag full of money. Taking care not to touch the money, the officer removed the bag from behind the driver's seat. When asked about it, Esqueda said the money did not belong to him. The truck and money were turned over to the sheriff's department.

The truck was towed to a yard. The money was then returned to its original location so that a drug detection canine search could be performed on the vehicle.

Agent Matt had worked the narcotics detail for the Stanislaus County Sheriff's Department since 1972 and had acted as a supervisor in the Stanislaus Drug Enforcement Agency since 1975. During that time, he participated in more than 1,000 cases involving narcotics trafficking; qualified numerous times as an expert witness in various fields related to narcotics identification, detection, trafficking, etc.; and became certified as an instructor in narcotic detection.

He and his canine, Jon-Jon, have worked together since 1990. Jon-Jon was originally purchased from the Denmark Police. Agent Matt and Jon-Jon went through six weeks of initial training with the Danish Police Master Trainers. Since then, Jon-Jon has undergone continuous training to maintain his proficiency in drug detection; has participated in approximately 2,674 searches where controlled substances were detected; and in 1992, along with Agent Matt, became nationally certified to detect heroin, opium, cocaine, methamphetamine, marijuana, and hashish.

In the early morning hours of the date in question, Agent Matt and Jon-Jon conducted a narcotics detection search of Esqueda's vehicle. The canine alerted to the brown paper sack of money placed behind the seat. This alert

indicated the presence of a controlled substance. A cellular telephone and battery charger were also found during this search.

Meanwhile, Esqueda had been booked into custody. During this process, the arresting officer learned that Esqueda was unemployed; the officer discovered $522.55 in cash and a pager among Esqueda's personal possessions.

The money in the bag was finally counted, and officers learned that they had confiscated $28,500 consisting of one thousand one-hundred twenty-five $20 bills and six hundred $10 bills.

Deputy Green then contacted Esqueda at the jail and asked him to identify the owner of the money. At first, Esqueda continued to deny ownership of the money, and later said "[he] didn't know" if it belonged to him, but ultimately signed a written disclaimer of ownership.

Agent Matt opined that, based on the facts of this case and his experience, there was probable cause to believe the money was subject to forfeiture. As support for his conclusion, Agent Matt made the following observations:

"a. Possession of a large cash hoard, transported in a paper sack, is highly unusual for an average law-abiding citizen, but not atypical for a person involved in the trafficking of controlled substances, a business typified by *cash* transactions.

"b. The possessor of the cash Edwin Esqueda is unemployed, ruling out legitimate earnings as a source for the money.

"c. The possessor of the cash, Edwin Esqueda, also possessed a pager, a cellular telephone, and over $500.00 in cash on his person. The pager and cell-phone are commonly used by drug traffickers to conduct business.

"d. Edwin Esqueda admitted to Alameda County homicide detectives on September 21, 1988, that he and Francisco Martin fronted one kilo of cocaine to a Christopher Parker on September 9, 1988. Mr. Parker was shot to death in Oakland later on September 9, 1988. It should also be noted that the driver of the Corvette in the instant case, identified as Francisco Montana is in fact Francisco Martin, leading to the conclusion that Esqueda and Martin have continued their relationship. Esqueda's admitted involvement in a prior major drug deal logically points to his current possession of a large cash hoard as arising from continued drug trafficking.

"e. Esqueda told both California Highway Patrol Officer Stuart Wagner and Deputy Sheriff Green he didn't know who the money belonged to. This

lack of knowledge about the $28,500.00 which he was transporting is obviously feigned, indicating the illicit nature of the money. If the money was from a legitimate source, why didn't Esqueda simply tell the officers instead of lying to them.

"f. The $28,500.00 consisted entirely of twenty and ten dollar bills. These small denominations, in such vast quantity, are highly typical of unlaundered drug proceeds.

"g. The 1991 Chevrolet stepside pickup which Esqueda was driving, was purchased by him on August 12, 1991, from Central Chevrolet in Fremont, California. He purchased the pickup for $16,265.00, using *$14,700.00* cash and the balance was paid with a rebate and a trade-in. Central Chevrolet filed an I.R.S. Form 8300 'Report of Cash Payments Over $10,000 Received in a Trade or Business,' as required by law. Such large cash transactions are unusual and inherently suspicious, hence the I.R.S. reporting requirement. His possession of such a large amount of cash in August, 1991, could suggest Esqueda's continued involvement in the drug trade.

"h. Within a week of Esqueda's arrest in the instant case, he transferred title of the pickup to a Hector Delmuro of Hayward. This is an apparent attempt by Esqueda to sequester ownership of the pickup in a straw owner and hopefully avoid seizure and forfeiture."

In his response, Aguilar pointed out that the People's memorandum addressed the circumstances as they pertained only to Esqueda—a nonparty to this action who had made no claim to the confiscated money—and failed to consider Aguilar's circumstances. In an attachment to the response, Aguilar declared, under penalty of perjury, that:

"1. I am the Claimant in the above entitled action.

"2. I am the owner of Los Chiles Taqueria, a bar and restaurant located at #4 Embarcadero Center, San Francisco, California. This large restaurant (of 1900 square feet in area) is a very successful, money-making enterprise, operating in a prime location in the San Francisco financial district. I have been in the restaurant business for many years.

"3. I have attended various automobile auctions on a statewide basis in order to buy cars for me and members of my family. I ordinarily take cash with me to purchase the automobiles that I have successfully bid on.

"4. A few weeks before the $28,500 was seized, Rafael Martin, my former business partner, asked me to lend his friend Edwin Esqueda

$28,500. He told me that Mr. Esqueda needed the money to buy automobiles at an auto auction in Modesto. I provided this money to Mr. Martin. Mr. Martin said that Mr. Esqueda would pay me 12% interest and also promised that the money would be paid back within six months.

"5. I understand that Mr. Esqueda was stopped in Modesto on August 28, 1992 and charged with driving under the influence, and that at that time the police seized the money on the hunch that it might be drug money. I believe he lives in Modesto, but I do not know anything more about his being stopped. I have no knowledge of any drug activities connected with this money nor did I intend that it be used for any illegal purpose.

"6. I am not involved in any drug activities, and have never been arrested or convicted for a drug offense or any other criminal offense."

Aguilar's motion for the return of property was heard on November 16, 1992. Both Esqueda and Aguilar testified at the probable cause hearing— Esqueda on behalf of the People and Aguilar on his own behalf.[2]

Esqueda testified that he had recently turned 21 years of age, that he was unemployed in August of 1992 and, in fact, had never held a job. He said he was about to start his own business buying cars at the Modesto auto auction and reselling them at a profit. His intention was to attend the auction on the first Saturday of September and buy "some car." He did not, however, know how to get to the auction without looking at a map and could not recall when he last attended an auction at that location. When asked if he was a registered buyer with Ernst and Associates, Esqueda said anyone could attend the auction. He also admitted he was not a mechanic.

Esqueda said the $28,500 came from Aguilar. He initially said he had only known Aguilar a few months when he picked up the money and placed it in a brown sack at Aguilar's restaurant, Los Chiles, in San Francisco. Later, he said that was the first time he had ever seen Aguilar.

According to Esqueda, the only "collateral" given for the loan was his word. He intended to pay Aguilar back, with 12 percent interest, from the profits he hoped to make selling cars.

Esqueda was also questioned about his involvement with an Alameda County homicide investigator in 1988. Esqueda's attorney objected to the use of this information since Esqueda was "granted immunity" in that case. The People and the court were completely unaware of any such grant.

[2]Because Esqueda's driving under the influence case was still pending, he was represented by separate counsel during the probable cause hearing.

The People informed the court that they were not seeking to prosecute Esqueda but rather to discover the source of the $28,500. It was their position that Esqueda's prior involvement in a drug deal was relevant in that it tended to show that he had remained in the business.

Counsel for Aguilar said he "also object[ed]" to the use of the evidence on grounds of relevancy and improper use of character evidence. Once the court satisfied itself that the prior action had been concluded, it overruled the objections and ordered Esqueda to answer the question.

Counsel for Esqueda then objected on Fifth Amendment grounds unless the prosecutor was willing to grant his client immunity. The court overruled this objection as well and again ordered Esqueda to answer the question.

Esqueda acknowledged being interviewed by a homicide detective in 1988. He admitted telling the detective that he, Esqueda, and Francisco Martin had "fronted" the homicide victim a kilo of cocaine on the date of his death.

Esqueda also admitted to having purchased his 1991 Chevrolet from a dealership in Fremont. He said he paid for the truck out of money he had in savings. When asked how he could save over $14,000 when he had never been legitimately employed, Esqueda answered, "I just had it."

Esqueda admitted selling the truck approximately one week after he was stopped. He initially claimed to have sold the truck because he needed money but when pushed, finally admitted that he was afraid the truck would be seized as well.

Esqueda was also asked why he had a cellular phone if he was unemployed. He said it belonged to a friend who lived in Oakland but whose address he could not recall. He maintained his friend just left it in the truck.

Esqueda was then asked why he had a pager if he was unemployed. Esqueda's response was, "Just for you know."

When asked why he had $529.55 in his pocket, Esqueda replied, "because." The People's attempts to press further were frustrated by defense counsel's assertion of Esqueda's Fifth Amendment rights.

In concluding their presentation in support of a finding of probable cause, the People offered into evidence the declarations of the three law enforcement officers and a Mr. Brunelli.[3]

Counsel for Aguilar objected to Officer Matt's declaration on the ground that the information contained in paragraph six and specifically subparagraphs d, e, g, and h was not based on the officer's personal knowledge. He also objected to Mr. Brunelli's declaration because it did not meet the requirements for the business records exception to the hearsay rule.

The People countered that section 11488.4, subdivision (g)(1) allows the court to consider hearsay in making the probable cause determination.

Counsel for Aguilar responded that declarations and affidavits are allowed to be considered under the statute cited by the People but only if the information contained therein is within the affiant's personal knowledge.

The court went on with the hearing without expressly ruling on the objections.

Aguilar was then called to the stand. The People anticipated that Aguilar's testimony would be directed at establishing an innocent owner defense. They objected to such testimony in that it would be beyond the scope of a probable cause hearing. Once again, the court did not rule on the objection but simply continued on with the hearing.

Aguilar then testified that he was a manager and owner of the Los Chiles restaurant. He later acknowledged that his name was not reflected "on the ownership" but explained that it was because the restaurant had sustained $200,000 in losses and the property owner would not transfer the leasehold interest until Aguilar was in a position to negotiate the "whole lease."

Aguilar said he was introduced to Esqueda by his father's former partner, Rafael Martin. Aguilar admitted that he did not know Esqueda very well when he agreed to loan him the money for six months at 12 percent interest. Aguilar said he made the loan hoping to make money.

On cross-examination, Aguilar said he did not know if there was a relationship between Francisco Martin and Rafael Martin. When asked if he was in the habit of making $28,500 unsecured loans to people, Aguilar

---

[3]Other references in the record suggest that Mr. Brunelli worked at the dealership where Esqueda purchased his truck. This declaration was not, however, made a part of the record on appeal.

responded that Rafael Martin had agreed to repay the loan if Esqueda failed to do so. Aguilar maintained that Rafael Martin was a very good friend of his and a man of his word; but when questioned, acknowledged that he did not know where Rafael Martin lived or what he was currently doing to earn a living.

Aguilar was also asked about the denominations of the bills he loaned Esqueda. He responded that he keeps more than the amount loaned to Esqueda in $10 and $20 bills in his safe. Aguilar thought it better to keep his money in a safe than an interest bearing bank account.

Counsel for Aguilar then successfully moved into evidence what he represented to be a copy of the minute order granting Esqueda's suppression motion in his related criminal matter. The uncertified copy provided on appeal is of rather poor quality. The date of the minute order is not legible. While Esqueda's name and the notation reflecting that a section 1538.5 motion was granted can be deciphered, only one of two charged offenses can be read; that being Vehicle Code section 23152.

The matter was then taken under submission. The court ultimately rejected Aguilar's objections to paragraphs 6d, 6e, and 6h of Agent Matt's declaration, found probable cause to believe the $28,500 was subject to forfeiture, and denied Aguilar's motion for the return of the seized property.

In March of 1993, the People filed their motion for summary judgment. They asked the court to take judicial notice of the file in this matter and attached a copy of the probable cause hearing transcript. The People also provided the court with a document Aguilar supplied during discovery entitled, "Promissory Note." This note purportedly evidenced Aguilar's unsecured loan to Esqueda of $28,500 on August 27, 1992, and indicated that the principal plus 12 percent interest was to be repaid no later than "February 27, 1992."

In advancing their motion, the People argued that Aguilar was nothing more than a general unsecured creditor of Esqueda's and, in that capacity, had no standing to challenge the seizure and/or forfeiture of the money. The People listed the following undisputed facts in support of their position: (1) Aguilar loaned Esqueda $28,500; (2) the only "collateral" given for the loan was Esqueda's word; (3) Aguilar's "security" for the loan was the word of Rafael Martin if Esqueda subsequently defaulted on the loan; (4) Rafael Martin was a very good friend of Aguilar's; (5) Aguilar "thinks" Rafael Martin lives in Oakland and did not know what he does for a living; and (6) there is probable cause to believe the $28,500 is subject to forfeiture. Based

on these facts, the People asked the court to grant summary judgment in their favor and against Aguilar.

In his opposition papers filed April 19, 1993, Aguilar argued that he was the owner of the money in question. Without citation to authority, Aguilar initially argued that his ownership interest in the money continued until such time as Esqueda did "something" with the funds. In other words, Esqueda merely possessed Aguilar's money.

Aguilar argued in the alternative that, even as a general creditor, he had a legitimate interest in the seized cash. He cited *U.S.* v. *Reckmeyer* (4th Cir. 1987) 836 F.2d 200 as support for this contention.

In his accompanying declaration, Aguilar stated that the money he loaned Esqueda had come from his restaurant business. Due to the public nature of that business, it was very easy to receive contaminated money. Aguilar argued that the court should not expect him to keep a specially trained canine at the cash register so as to avoid receiving contaminated funds.

A declaration was submitted by Esqueda as well. In it, Esqueda declared that he had not spent or commingled the funds seized by the officers with any other money. He said he disclaimed ownership of the money because it belonged to Aguilar. Esqueda said he telephoned Aguilar to let him know what happened to the money as soon as he was released from custody.

A declaration of Rafael Martin was also presented in opposition to the People's motion. Martin declared that he was the one who came up with the idea for Esqueda to buy and sell cars. Esqueda was supposed to keep the money at home in a safe place so that they could get to it if they were successful at the auction. Martin said that, as far as "we" were concerned, the money still belonged to Aguilar when it was seized because they had not used the money to buy any vehicles.

In his response, Aguilar noted that the "facts" asserted in paragraphs 1-3 and 6 of the People's statement of undisputed material facts were not facts at all but instead involved questions of law. He also asserted that the facts presented in paragraphs 4 and 5 of the People's statement were not material in that they had no bearing on Aguilar's standing to challenge the forfeiture.

Aguilar then went on to state four material facts which he believed were in dispute, namely: (1) whether Esqueda has any significant assets other than the truck, the money, and the approximately $520 he had on his person at the time of the arrest; (2) whether Esqueda did anything with the money other

than put it in a paper bag and place it in his truck; (3) whether Aguilar supplied the seized cash; and (4) whether Aguilar and Esqueda regarded the money as belonging to Aguilar at the time of its seizure.

Aguilar did not believe the following issues were material to the motion but, because the People felt they were, he wished to point out that they were in dispute: (1) whether any of the involved persons was then dealing in drugs; and (2) whether the immunity agreement precluded the People from relying on any of Esqueda's testimony regarding his involvement in the 1988 homicide investigation.

On April 13, 1993, Aguilar filed a supplemental memorandum in opposition to the People's motion for summary judgment in which he asked the court to allow Esqueda the opportunity to file a late claim as a person having a right to possess the property in question.

On April 19, 1993, the court granted the People's motion for summary judgment after finding that Esqueda was the owner of the money and that Aguilar lacked standing. The court relied on the undisputed fact that Aguilar loaned the money to Esqueda, that the only security for the loan was the word of Martin should Esqueda default (contained in paragraphs 1 and 3 of the People's statement of undisputed material facts), the promissory note, and the case of *People* v. *Fifteen Thousand Two Hundred Seventeen Dollars* (1990) 218 Cal.App.3d 720 [268 Cal.Rptr. 450] in reaching this conclusion. The money was, accordingly, ordered forfeited to the State of California.

The court denied Esqueda's request to file a late claim but did so without prejudice to renew his request after full briefing had been accomplished. This denial was upheld on appeal.

Sixty days later, Aguilar filed a "notice of appeal." We dismissed the appeal by order dated October 12, 1994, citing the lack of a final judgment.

On December 16, 1994, Aguilar obtained a judgment in favor of the People and timely filed his notice of appeal on January 30, 1995.

We affirm.

## DISCUSSION

We begin with an overview of the law related to California's forfeiture proceedings and summary judgment motions since a basic understanding of these principles is necessary to resolve the issues presented on appeal.

*General Principles of State Forfeiture Law*[4]

■ Forfeiture is a civil in rem action in which the property is proceeded against as a defendant on the legal fiction that the property itself is the guilty party. (See § 11488.4, subd. (a); *Calero-Toledo* v. *Pearson Yacht Leasing Co.* (1974) 416 U.S. 663 [40 L.Ed.2d 452, 94 S.Ct. 2080]; *People* v. *Superior Court* (*Rishwain, Hakeem & Ellis*) (1989) 215 Cal.App.3d 1411 [264 Cal.Rptr. 28]; *People* v. *$6,500 U.S. Currency* (1989) 215 Cal.App.3d 1542 [264 Cal.Rptr. 294].)

Section 11470, subdivision (f), found within division 10, chapter 8 of the California Uniform Controlled Substances Act, makes subject to forfeiture the moneys furnished or intended to be furnished by any person in exchange for a controlled substance, all proceeds traceable to such an exchange, and all moneys which were used or intended to be used to facilitate any violation of the controlled substances laws. Such property "may be seized by any peace officer . . . without process . . . if . . . [t]here is probable cause to believe that the property was used or is intended to be used in violation of this division." (§ 11471.)

"Except as provided in subdivision (j) [which allows for nonjudicial forfeiture proceedings under circumstances not present herein], if the . . . district attorney determines that the factual circumstances do warrant that the property seized . . . comes within the provisions of subdivisions (a) to (g), inclusive, of Section 11470, and is not automatically made forfeitable or subject to court order of forfeiture or destruction by another provision of law, the . . . district attorney shall file a complaint for forfeiture with the superior court . . . in which the property subject to forfeiture has been seized . . . ." (§ 11488.4, subd. (a).)

"No sooner than 10 days after a complaint is filed pursuant to this section, a claimant, who alleges standing based on an interest in the property which arose prior to the seizure or the filing of the complaint for forfeiture, whichever occurs first, may move the court for the return of the property named in the claim on the grounds that there is not probable cause to believe that the property is subject to forfeiture pursuant to Section 11470." (§ 11488.4, subd. (g)(1).) In order to counter this claim, the prosecution must show that such probable cause exists. (§§ 11488.4, subd. (i); 11492, subd. (b).)

"The showing of probable cause may be supported by evidence, prior judicial testimony, deposition, affidavit, or declaration." (§ 11488.4, subd.

---

[4]This case is governed by the forfeiture statutes as they existed immediately prior to the 1994 amendments. As such, the following references are to the forfeiture statutes which predate the 1994 amendments.

(g)(1).) The showing is not limited to the evidence at the time of the seizure but may also include later acquired evidence. (*People* v. *Superior Court (Moraza)* (1989) 210 Cal.App.3d 592, 601-602 [258 Cal.Rptr. 499], citing *Boas* v. *Smith* (4th Cir. 1986) 786 F.2d 605, 609; *United States* v. *Kemp* (4th Cir. 1982) 690 F.2d. 397, 401; *U.S.* v. *One 1978 Mercedes Benz, Four-Door Sedan* (5th Cir. 1983) 711 F.2d 1297; see also *People* v. *Superior Court (Rishwain, Hakeem & Ellis)*, *supra*, 215 Cal.App.3d 1411; 2 Kessler, Civil and Criminal Forfeiture (1996) § 13.08, pp. 13-21 to 13-22.)

"If the court determines that there is not probable cause to believe that the property is subject to forfeiture it shall order the property returned to the owner thereof unless the property is otherwise lawfully held." (§ 11488.4, subd. (g)(1).) If the court rules that probable cause exists, the matter may proceed to adjudication at what is known as a forfeiture hearing.

Where, as here, a third party claim is involved, the forfeiture hearing shall be heard by a jury unless waived by consent of all parties. (§ 11488.5, subd. (e)(2).) Forfeiture shall be ordered when, at the conclusion of the hearing, the People have shown by a preponderance of the evidence that: (1) the property is subject to forfeiture pursuant to section 11470; and (2) the person claiming an interest in the seized property knew or should have known of facts which made the property subject to forfeiture under section 11470. (§§ 11488.4, subd. (i), 11488.5, subds. (f), (h).) "If the court or jury does not make these findings, the court shall order that the person's interest in the property be returned." (§ 11488.5, subd. (h).) "All property which was the subject of a forfeiture hearing and which was not released by the court to a claimant shall be declared by the court to be forfeited to the state." (§ 11488.5, subd. (i).)

Three final observations are in order. First, the provisions of the Code of Civil Procedure are applicable to the proceedings in chapter 8 regarding the seizure and disposition of property subject to forfeiture unless otherwise inconsistent with the provisions or procedures in that chapter. (§ 11488.4, subd. (i).)

Two, federal case law is instructive in the area of forfeiture because the California forfeiture statute is patterned after the federal drug forfeiture statute. (Cf. Health & Saf. Code, § 11470 et seq. with 21 U.S.C. § 881.)

Three, in construing these statutes, it must be remembered that "[s]tatutes imposing forfeitures are not favored and are to be strictly construed in favor of the persons against whom they are sought to be imposed." (*Baca* v. *Minier*

(1991) 229 Cal.App.3d 1253, 1265 [280 Cal.Rptr. 810], citing *People* v. *One 1937 Lincoln etc. Sedan* (1945) 26 Cal.2d 736, 738 [160 P.2d 769]; accord, *People* v. *One 1986 Toyota Pickup* (1995) 31 Cal.App.4th 254, 261-262 [37 Cal.Rptr.2d 29]; *People* v. *$6,500 U.S. Currency, supra,* 215 Cal.App.3d at p. 1547.)

*General Principles Related to Summary Judgment Motions*

"Any party may move for summary judgment in any action or proceeding if it is contended that . . . there is no defense." (Code Civ. Proc., § 437c, subd. (a).[5]) Both the motion and, where appropriate, the opposition to the motion "shall be supported by affidavits, declarations, admissions, answers to interrogatories, depositions, and matters of which judicial notice may be taken." (Code Civ. Proc., § 437c, subd. (b).) The proponent of the motion is also required to submit a separate statement of all material facts which he or she contends are undisputed. (*Ibid.*) The opposition papers must include a separate statement which responds to each of the material facts the moving party alleges are undisputed. (*Ibid.*)

"The motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); see also *Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 35 [210 Cal.Rptr. 762, 694 P.2d 1134]; *Lipson* v. *Superior Court* (1982) 31 Cal.3d 362, 374 [182 Cal.Rptr. 629, 644 P.2d 822].) As pertinent, the 1993 version of section 437c of the Code of Civil Procedure also provided that:

"(n) For purposes of motions for summary judgment and summary adjudication:

"(1) A plaintiff . . . has met his or her burden of showing that there is no defense to a cause of action if that party has proved each element of the cause of action entitling the party to judgment on that cause of action. Once the plaintiff . . . has met that burden, the burden shifts to the defendant . . . to show that a triable issue of one or more material facts exists as to that cause of action."[6]

■ In ruling on such motions, the trial court must bear in mind that its purpose "is merely to determine whether [triable issues of fact] exist, and not

---

[5]All citations to the Code of Civil Procedure are to the 1993 version of the code since that is the version utilized by the court below in rendering its decision.

[6]The quoted language is now found in subdivision (o) of the statute. The words "of a defense thereto" were subsequently added to the end of the second sentence. (See Stats. 1993, ch. 276, § 1 (Assem. Bill No. 498).)

to decide the merits of the issues themselves. [Citation.]" (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) It must be forever mindful that summary judgment is a drastic measure that deprives the losing party of a trial on the merits and, accordingly, should be used with caution. (*Ibid.*) "The affidavits of the moving party should be strictly construed, and those of the opponent liberally construed. . . . Any doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. [Citations.]" (*Ibid.*)

The reviewing court is also bound by these principles. (*Heredia* v. *Farmers Ins. Exchange* (1991) 228 Cal.App.3d 1345, 1353-1354 [279 Cal.Rptr. 511]; *Stratton* v. *First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1083 [258 Cal.Rptr. 721]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs 1 (The Rutter Group 1995) ¶ 8:117, rev. #1, 1995.) We are to make a de novo determination as to whether there is a triable issue of fact and whether the moving party is entitled to judgment as a matter of law. (*Saldana* v. *Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1511-1515 [285 Cal.Rptr. 385].) In making this determination, we can consider only those facts that were before the trial court. (*Sacks* v. *FSR Brokerage, Inc.* (1992) 7 Cal.App.4th 950, 962 [9 Cal.Rptr.2d 306]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs 1, *supra*, ¶ 8:164, rev #1, 1995.)

With these principles in mind, we turn to the specific issues presented on appeal.

A. *The Determination That Aguilar Lacked Standing*

Aguilar contends the trial court erred when it found he did not have standing to contest the forfeiture of the $28,500. He initially argues the People waived their right to challenge his standing by failing to raise the issue at the probable cause hearing.

This argument overlooks one very important thing—Aguilar did not raise this argument in the trial court. As such, it did not factor into the decision which we have been called upon to evaluate.

Aguilar next claims he was conferred standing by timely filing his verified claim opposing the forfeiture in this action. The parties have not cited and we are not aware of any California case directly on point.

To support his claim, Aguilar has cited the following highlighted language taken from our decision in *People* v. *$400* (1993) 17 Cal.App.4th 1615, 1620 [22 Cal.Rptr.2d 161] where we were called upon to decide whether an

answer in a judicial forfeiture action had to be verified: "The purpose of the statutorily mandated claim is different from that of the answer. The claim is intended to assert an interest in the property, *confer standing to the claimant*, and to terminate the administrative forfeiture procedure, thereby forcing judicial proceedings. The answer is filed in a judicial action and raises issues of fact for trial, *places the allegations of the complaint at issue and raises any affirmative defenses*. [Citations.] . . . ." (*Ibid.*, italics added.)

The only standing assured by the filing of a verified claim is that needed to require the government to pursue forfeiture proceedings through judicial rather than administrative proceedings. (§ 11488.4, subd. (j).)[7] Neither the California statutes nor the limited cases construing them *guarantee* that this "standing" will carry over to the judicial forfeiture action so that a claimant need do nothing more than file a verified claim to prove his/her ownership interest or other legally cognizable interest in the subject property.

■ In the federal system, if the government challenges the claimant's standing, the claimant has the burden of establishing the facts upon which he/she claims standing to contest the forfeiture. (*U.S.* v. *$38,570 U.S. Currency* (5th Cir. 1992) 950 F.2d 1108, 1112-1113; 1 Smith, Prosecution and Defense of Forfeiture Cases (1996) ¶ 9.04, p. 9-68.7.) In other words, the claimant must establish a legally cognizable interest in the subject property in order to establish his/her right to challenge the government's action seeking forfeiture of that property. "Unless a claimant can first establish his standing he has no right to put the government to its proof.[15]" (Prosecution and Defense of Forfeiture Cases, *supra*, ¶ 9.04, p. 9-68.8; accord *U.S.* v. *One Parcel of Real Estate* (11th Cir. 1992) 963 F.2d 1496, 1500.) Footnote 15 provides: "United States v. $321,470.00, U.S. Currency, 874 F.2d 298, 303 (5th Cir. 1989); United States v. Fifteen Thousand Five Hundred Dollars ($15,500.00) United States Currency, 558 F.2d 1359, 1361 (9th Cir. 1977). *See also* United States v. Five Hundred Thousand Dollars, 730 F.2d 1437, 1439 (11th Cir. 1984), quoting United States v. Three Hundred Sixty-Four Thousand Nine Hundred Sixty Dollars ($364,960.00) in United States Currency, 661 F.2d 319, 326 (5th Cir. 1981) ('[A] party seeking to challenge the government's forfeiture of money or property used in violation of federal law must *first* demonstrate an interest in the seized item sufficient to satisfy the court of its standing to contest the forfeiture') (emphasis added).

---

[7]As pertinent, this subdivision states, "[i]f a claim is timely filed and served, then the Attorney General or district attorney shall file a complaint for forfeiture . . . ." (§ 11488.4, subd. (j).) There is no requirement that the claimant provide additional proof of his/her interest in the seized property before the government's obligation to pursue judicial forfeiture will arise.

There is language in a few opinions to the contrary—that the government must first show probable cause for the institution of the action before claimant is put to his proof of standing. United States v. One Parcel of Real Property, 942 F.2d 74, 79 (1st Cir. 1991); United States v. United States Currency Amounting to the Sum of Thirty Thousand Eight Hundred Dollars ($30,800.00), 555 F. Supp. 280, 282 (E.D.N.Y.), aff'd mem. 742 F.2d 1444 (2d Cir. 1983), quoting United States v. Eleven Thousand Five Hundred and Eighty Dollars ($11,580.00) in United States Currency, 454 F. Supp. 376, 377 (M.D.Fla. 1978). If that were the law, then persons with no interest whatsoever in seized property could make a handsome living filing claims. United States v. Real Property Located at 16510 Ashton, 47 F.3d 1465 (6th Cir. 1995) (Boggs, J., dissenting) (quoting this treatise). Some cases have dealt with this problem by adjudicating claimant's right to the property *after* holding it not subject to forfeiture. United States v. One 6.5 mm. Mannlicher-Carcano Military Rifle, 406 F.2d 1170, 1172 (5th Cir. 1969); United States v. $22,993.00 in Currency, 332 F. Supp. 1277, 1279 (E.D.La. 1971). *See also* United States v. Seventeen Thousand Four Hundred Dollars in Currency, 524 F.2d 1105 (10th Cir. 1975) (dissenting opinion). However, where the government challenges claimant's standing in a timely manner the issue should logically be decided at the outset rather than at the end of the forfeiture proceeding." (Prosecution and Defense of Forfeiture Cases, *supra*, ¶ 9.04, p. 9-68.8, fn. 15.)

 It can be seen then that standing is ordinarily treated as a threshold legal issue in the federal system. We see no reason to apply a different rule in proceedings initiated under the California forfeiture statutes. Thus, the question remains whether appellant met his burden of establishing a legally cognizable interest in the subject property sufficient to confer him standing to challenge the government's action in this proceeding. As explained more fully below, we conclude that he has not met his burden.

Under both the federal and state systems, a claimant must show he has a recognizable legal or equitable interest in the seized property in order to establish standing. (E.g., *U.S.* v. *$38,570 U.S. Currency*, *supra*, 950 F.2d at pp. 1111-1112 [discussing federal law]; *U.S.* v. *Campos* (6th Cir. 1988) 859 F.2d 1233, 1238-1239 [same]; *U.S.* v. *Reckmeyer*, *supra*, 836 F.2d at pp. 205-206 [same]; *People* v. *Fifteen Thousand Two Hundred Seventeen Dollars*, *supra*, 218 Cal.App.3d at pp. 724-725 [discussing state law].) Standing has been recognized where the potential claimant has a bona fide ownership, possessory, or security interest in the property seized. (See, e.g., § 11488.5, subd. (a)(1); *People* v. *Fifteen Thousand Two Hundred Seventeen Dollars*, *supra*, 218 Cal.App.3d 720; *U.S.* v. *Property at 4492 S. Livonia Rd., Livonia* (2d Cir. 1989) 889 F.2d 1258; *U.S.* v. *$38,000.00 in U.S. Currency* (11th Cir. 1987) 816 F.2d 1538.)

As noted previously, the trial court relied on *People* v. *Fifteen Thousand Two Hundred Seventeen Dollars*, *supra*, 218 Cal.App.3d 720 to find that appellant did not have standing to challenge the forfeiture in this case. Appellant claims this reliance is misplaced in that the case had nothing to do with standing. His argument, as we see it, is rather shortsighted.

■ In *People* v. *Fifteen Thousand Two Hundred Seventeen Dollars*, *supra*, 218 Cal.App.3d 720, the drug dealer's ex-wife moved the court pursuant to Code of Civil Procedure section 473 to set aside the order of forfeiture six months after its entry on the ground that, as a judgment creditor for family support, she had a lawful claim to the money forfeited and was never given notice of the forfeiture proceedings. (218 Cal.App.3d at p. 722.) The district attorney took the position that she had no legally cognizable claim to the money. (*Id.* at p. 723.) The trial court denied the claim on the ground that the ex-wife was not an interested party and the Court of Appeal, relying on both federal and state law, affirmed that decision. (*Id.* at pp. 723, 725.)

In reaching this conclusion, the appellate court observed:

"It is beyond question that the designated 'interested party' includes a bona fide or innocent purchaser or a person holding a valid lien, mortgage, security interest or interest under a conditional sales contract, as expressly provided under the relevant statutes. (§§ 11488.6, 11489, subd. (a).) But Streem [the ex-wife] had no such interest in the $15,217 in currency. Although she had a valid judgment, it did not—without more—give her a lien on, or a security interest in, [the drug dealer's] cash which was seized.

"We recognize, of course, that a recorded judgment for child and spousal support payments will create a lien on the debtor's *real* property (Code of Civ. Proc., §§ 697.320, 697.340) and that a judgment lien may also be created on the debtor's *personal* property by virtue of a levy under a writ of execution (Code Civ. Proc., §§ 697.520, 600.010 et seq.) or by perfecting a security interest (Code Civ. Proc., § 697.530). However, Streem did not levy under a writ of execution, and the security interest procedure is not applicable to currency. (Code Civ. Proc., § 697.530.) Consequently, all Streem possessed was an unsecured judgment-debt owed her by [the drug dealer].

"Because the California forfeiture statute is patterned after the federal statute (21 U.S.C. § 881), federal case law is instructive. The federal courts have held that although an unsecured creditor has a broad interest in the entire estate of a criminal defendant, an unsecured creditor has no interest in any particular asset. Thus, the interest of an unsecured creditor in seized

currency is not cognizable in forfeiture proceedings. (E.g. *United States* v. *Campos* (6th Cir. 1988) 859 F.2d 1233, 1238-1239 [creditors owed money wages and money for goods sold were not interested parties entitled to challenge forfeiture]; see *United States* v. *Reckmeyer*[, *supra*,] 836 F.2d [at p.] 206, fn. 3; cf. *United States* v. *$41,305 in Currency* (11th Cir. 1986) 802 F.2d 1339, 1346 [creditor proving perfected security interest in money may intervene in forfeiture proceeding].) It has also been held that even when the debtor criminal defendant had earmarked the funds for the benefit of another, the intended recipient has no legally cognizable interest in the assets. (*United* States v. *Four Million, Two Hundred Fifty-Five Thous.* (11th Cir. 1985) 762 F.2d 895, 907, cert. den. 474 U.S. 1056 [88 L.Ed.2d 772, 106 S.Ct. 795] [holder of check drawn on seized bank account has neither legal nor equitable interest in deposited funds]; *United States* v. *$47,875.00 in U.S. Currency* (5th Cir. 1984) 746 F.2d 291, 293-294 [parents who gave son money to finance oil venture had no legally cognizable interest in seized currency].)" (218 Cal.App.3d at pp. 724-725.)

■ Aguilar correctly notes that the *ultimate* issue to be decided in *People* v. *Fifteen Thousand Two Hundred Seventeen Dollars*, *supra*, 218 Cal.App.3d 720 differed from that currently before this court. But he has ignored the fact that the ultimate decision in both cases turned on the resolution of the same underlying issue—whether the claimant was an interested party within the meaning of the forfeiture statutes. We agree with the analysis employed in *Fifteen Thousand Two Hundred Seventeen Dollars*.

Aguilar tries to differentiate his situation from those found in *People* v. *Fifteen Thousand Two Hundred Seventeen Dollars* and the cases cited therein. He contends each of those cases involved either commingled assets, transformed assets, or unliquidated claims against only a portion of a larger estate. He argues that his situation is different in that *his* money had not been commingled with any other assets so that it was directly traceable to the seized money.

This argument overlooks the obvious. Once the loan was made, Aguilar no longer retained an *ownership* interest in the actual dollars loaned to Esqueda. (*United States* v. *$47,875.00 in U.S. Currency* (5th Cir. 1984) 746 F.2d 291; 1 Smith, Prosecution and Defense of Forfeiture Cases, *supra*, ¶ 9.04, p. 9-68.17.) Instead, Aguilar had an unliquidated, unsecured, debt owed to him by Esqueda—a debt which would not become due until roughly six months after the money was seized. All right, title and interest in any property found to be subject to forfeiture under section 11470 vested in the state upon commission of the illegal act which gave rise to forfeiture under chapter 8. (§ 11470, subd. (h).)

Aguilar argues in the alternative that he should be allowed standing because Esqueda had no substantial assets other than the money seized and a pickup truck. He claims *U.S. v. Reckmeyer, supra,* 836 F.2d 200, would allow him, as a general creditor, standing when the government seeks forfeiture of all of the debtor's assets and the creditor had given valuable consideration to the debtor's estate. *Reckmeyer* does indeed allow a general unsecured creditor to make claim in a criminal forfeiture proceeding under such circumstances, but Aguilar has once again overlooked the obvious.

Apart from the fact that this was a civil in rem forfeiture action, the government did not seek forfeiture of Esqueda's entire estate. While Aguilar no longer had his truck, that fact that he sold it necessarily implies that he received money in exchange. In addition, while Esqueda has never held a legitimate job, he has shown that he was capable of raising more than $14,000 cash to pay for his vehicle. We have no reason to believe that Esqueda will not replace his truck or obtain other items of personal property in the future which Aguilar could use to satisfy the debt owed him by Esqueda. In any event, Aguilar is not without recourse as he can seek repayment from Martin. His reliance on *Reckmeyer* is, accordingly, misplaced.

Aguilar also argued that a triable issue of material fact existed which would preclude the granting of summary judgment because the positions maintained by the People and Aguilar were adverse to one another. More specifically, Aguilar points to the People's position that the money belonged to Esqueda who had earned it selling drugs and Aguilar's contrary position that he had loaned the money to Esqueda for a legitimate business purpose. This conflict, Aguilar maintains, was an issue for trial. He is mistaken.

In advancing their motion for summary judgment, the People, like Aguilar, took the position that Aguilar was an unsecured general creditor of Esqueda's. There was no conflict on this point. Since an unsecured general creditor does not have standing under the circumstances presented by this case, there was no need to resolve this issue at trial.

For the first time in his reply brief, Aguilar argues that Esqueda assigned his right to claim the money to Aguilar and that the assignment provided an adequate basis for standing. This argument must fail for two reasons. One, we cannot fault the trial court for failing to find standing on this basis since this argument was not presented for its consideration. Two, there is nothing in the record to support an assignment. Contrary to Aguilar's interpretation, Esqueda's assertion that he understood the money to belong to Aguilar *at the time of its seizure* is not evidence of an assignment of Esqueda's rights to seek the return of the money in question.

## B. *The Probable Cause Determination*

Aguilar contends his lack of standing was irrelevant since the People failed to meet their burden of establishing probable cause to support the forfeiture. Aguilar cannot be heard to complain of any shortcomings in this regard. Since he failed to establish his standing, there was no case or controversy as to him. His interests are simply not affected by any decision of the trial court as to the forfeitability of the property in question. He has not advanced any other basis which would give him the right to contest the forfeiture.

The judgment is affirmed.

Stone (W. A.), J., and Vartabedian, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 12, 1997.